ORIGINAL

AO 91 (Rev. 11/82)

## CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>ANAIT KHUDAGULYAN | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>**M** 16 02137 |
|---|---|

Complaint for violation of Title 18, United States Code, Sections 2261A(2)(B)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE .      PAUL L. ABRAMS | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>October 25, 2016 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN)<br>FILED<br>CLERK, U.S. DISTRICT COURT<br>OCT 2 5 2016<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY                    DEPUTY |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

$$[18 \text{ U.S.C. } \S 2261A(2)(B)]$$

Beginning on a date unknown and continuing to on or about October 25, 2016, in Los Angeles County, within the Central District of California, defendant ANAIT KHUDAGULYAN, with the intent to harass and intimidate S.J. used the mail, an interactive computer service or electronic communication service or electronic communication system of interstate commerce, and other facilities of interstate and foreign commerce, including cellular telephone networks, electronic mail, text messages, interstate wires, and the Internet, to engage in a course of conduct that caused, attempted to cause, and would have been reasonably expected to cause substantial emotional distress to S.J. in violation of Title 18 United States Codes Section 2261A(2)(B).

LODGED
OCT 25 PM

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:  N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**ALLAN R. MACKINS**<br><br>OFFICIAL TITLE<br>Special Agent – Federal Bureau of Investigation |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1] | DATE<br>October 25, 2016 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA Karen Escalante  x3358      REC: Detention

**AFFIDAVIT**

I, ALLAN R. MACKINS, being duly sworn, declare and state as
follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of
Investigation ("FBI"), and have been so employed since May 2015.
I am assigned to the Violent Crimes squad where I have been
responsible for investigating violent crimes, including
interstate threats, as well as murder for hire, extortion, bank
robberies, and kidnappings within the FBI Los Angeles division
territory.  I also completed 21 weeks of training at the FBI
Academy at Quantico, Virginia, where I received formal training
in criminal investigative techniques.

2.   During the course of my employment with the FBI, I
have employed, or been involved in investigations that employed,
various investigative techniques including search warrants,
court-authorized interception of wire, oral, and electronic
communications, pen registers/trap and trace, telephone toll
analysis, physical surveillance, confidential sources,
cooperating witnesses, grand jury proceedings, and fugitive
apprehension tools.  Through my training, experience, and
interaction with other law enforcement officers, I am familiar
with the methods employed by those who seek retribution against
federal investigators.

## II. <u>PURPOSE OF AFFIDAVIT</u>

1.   This affidavit is made in support of a criminal complaint against ANAIT KHUDAGULYAN for a violation of 18 U.S.C. § 2261A(2)(B) (Stalking).

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. <u>SUMMARY OF PROBABLE CAUSE</u>

3.   Since April 2016, Federal Bureau of Investigation ("FBI") Special Agent ("SA") S.J. and S.J.'s family have been the target of a campaign of harassment believed to be orchestrated by KHUDAGULYAN, the wife or ex-wife of a former target of a Los Angeles-area healthcare fraud investigation in which S.J. was involved in his capacity as an FBI SA.  Since 2007, S.J. has resided in the Des Moines, Iowa area. KHUDAGULYAN, who resides in the Los Angeles area, has contacted S.J. via text message on his FBI-issued cellular telephone number and has contacted S.J.'s wife, J.J., via e-mails sent through GuerillaMail.com, an anonymous email address service. KHUDAGULYAN has also contacted numerous associates of S.J., including neighbors, friends, and clergy in the Des Moines area,

and has created a fictitious Yelp webpage that displays photographs of S.J., S.J.'s children, his in-laws, and his wife, and which includes disparaging remarks about S.J. and his family members.  Des Moines-area businesses have also received telephone calls from a female claiming to be S.J.'s wife and soliciting divorce and bankruptcy assistance.  The harassment campaign is ongoing and continuing in nature.

## IV. STATEMENT OF PROBABLE CAUSE

4.   On May 24, 2016, the Honorable Alka Sagar, United States Magistrate Judge, signed a search warrant in case number MJ16-2125, authorizing the search of KHUDAGULYAN.  A true and correct copy of the search warrant and affidavit in support is attached and incorporated herein, as Exhibit 1.

**A.   Harassment Scheme**

5.   In summary, in paragraphs 7 through 20, my affidavit stated the following:

a.   S.J. was one of the case agents assigned to the 10-year Durascam joint federal and state investigation into Medicare/Medi-Cal fraud in the Los Angeles area.  The lead prosecutor on the case was Los Angeles County Deputy District Attorney Amy Suehiro ("DDA Suehiro").  California Franchise Tax Board ("CFTB") SA Barbara Wynn ("SA Wynn") also worked on the investigation.

b.   One of the targets of that investigation, Dr. Thomas E. Mitchell ("Mitchell"), was criminally charged in California state court for operating a clinic that was engaged in illegal kickbacks for fraudulent medical charges.

c.    During the course of the 2012 trial proceedings against Mitchell, KHUDAGULYAN, who represented to S.J. that she was Mitchell's wife, approached S.J. during a recess in the trial proceedings and made inappropriate remarks to S.J.  After DDA Suehiro reported the contact to the court, the court sought to admonish KHUDAGULYAN, but KHUDAGULYAN could not be located.

d.    S.J. and KHUDAGULYAN have not had any contact again until this year.  S.J. currently resides in the Des Moines, Iowa area

e.    Beginning in April 2016, KHUDAGULYAN began to contact S.J., his family, S.J.'s associates, and Des Moines, Iowa area businesses, via telephone calls, text messages, and e-mails.  KHUDAGULYAN also contacted Urbandale Water Utility ("UBW") to inquire about shutting water and utility services off to S.J.s current residence.  KHUDAGULYAN made these contacts using various telephone numbers and e-mail addresses that were associated with her, as well as from the Studio City Rehabilitation Center which is believed to be her workplace.

**B.    Victim Impact**

6.    Between July and October 2016, I spoke with S.J. on multiple occasions regarding the events discussed above and within the affidavit attached hereto as Exhibit 1.  During those conversations, S.J. indicated to me that S.J. and his wife felt unsafe as a result of KHUDAGULYAN's actions and were feeling a great deal of anxiety about the extent of KHUDAGULYAN's knowledge and exploitation of their personal lives and they were fearful of what further actions KHUDAGULYAN might take against

4

them.  Based on my conversations with S.J., I also know the
following:

   a. S.J. was afraid to leave the United States on
business in July 2016 because of KHUDAGULYAN's conduct.

   b. J.J. was startled as a result of an unannounced
visit to her residence by a real estate agent who claimed to
have just spoken to her on the phone and remained apprehensive
about unannounced visitors.

   c. S.J. was distressed about the unauthorized
posting of pictures of his children on the Yelp website.

  **C. Execution of Search Warrants on October 25, 2016**

   7. On October 25, 2016, FBI agents, including myself,
executed the above-referenced search warrant at KHUDAGULYAN's
apartment in Glendale, California.[1]  Based on my personal
observations and on my conversations with the agents who
executed the search warrants, I know the following:

   a. During the execution of a search warrant at
KHUDAGULYAN's apartment, agents recovered several items of
evidence relevant to the warrant, including but not limited to:

    i. Office of Assessor, Dallas County Iowa,
property tax records for S.J. and J.J.;

    ii. "Beenverified" background database
documents dated June 11, 2016, in the name of S.J. and J.J.

    iii. Notebooks with several written notes
appearing to be pass codes containing S.J.'s first name.

---

[1] In case number MJ16-2123, Judge Sagar signed a warrant
for the search of KHUDAGULYAN's apartment.

b.   During a search of KHUDAGULYAN's person, agents recovered the following:

i.   a cellular telephone with a photograph of S.J. as the telephone screensaver;

ii.   a small composition notebook inside of a paper bag that KHUDAGULYAN was holding and with S.J.'s name and current address and written inside the notebook.

**D.   Interview of KHUDAGULYAN on October 25, 2016**

8.   On October 25, 2016, FBI SA Catherine Moore and myself interviewed KHUDAGULYAN inside the fitness center for the apartment complex in which KHUDAGULYAN's APARTMENT is located. I told KHUDAGULYAN that we would like to speak to hear about why we were present, and I told her that she was free to leave and not under arrest.   KHUDAGULYAN agreed to speak with us.   During the course of that audio-recorded interview, I learned the following:

a.   KHUDAGULYAN felt wronged by the agents who investigated her husband for Medicare fraud and was upset because she went bankrupt and was living inside of a home without water and power.

b.   KHUDAGULYAN said that she had tried to contact S.J. directly via text message because she "thought something was there."   KHUDAGULYAN explained that she believed she and S.J. had a connection, that she thought S.J. was attractive, and that S.J. once told her, "That ship has sailed," which she interpreted to mean that S.J. was attracted to KHUDAGULYAN.

c.    KHUDAGULYAN admitted that she had created a Yelp webpage with pictures of S.J., S.J.'s wife, and S.J.'s children.

d.    KHUDAGULYAN also admitted that she had sent e-mails to S.J.'s wife because KHUDAGULYAN had received mean e-mails.  When asked who sent KHUDAGULYAN the mean e-mails, KHUDAGULYAN was unable to provide a response.

e.    KHUDAGULYAN admitted that she had called S.J.'s water company and that she had pretended to be J.J. on the phone when speaking with the water company.

f.    Throughout the interview, KHUDAGULYAN said that she had not done anything wrong.

### V.  CONCLUSION

9.    For all the reasons described above, there is probable cause to believe that KHUDAGULYAN has committed a violation of 18 U.S.C. § 2261A(2)(B) (Stalking).

ALLAN R. MACKINS, Special
Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this 25TH day of October 2016.

HONORABLE ~~ALKA SAGAR~~    PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

7

# Exhibit 1



AO 106 (Rev. 04/10)  Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

In the Matter of the Search of     )
*(Briefly describe the property to be searched*     )
*or identify the person by name and address)*     )    Case No.
    ANAIT KHUDAGULYAN     )
    )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

    See Attachment A-1

located in the _____Central_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

    See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Sec. 2261A(a)(2)(B) | Stalking |

The application is based on these facts:

    See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
_____
*Applicant's signature*

ALLAN R. MACKINS, Special Agent
_____
*Printed name and title*

Sworn to before me and signed in my presence.

**ALKA SAGAR**
_____

Date: 10-24-16
    *Judge's signature*

City and state: Los Angeles, California

Hon. ALKA SAGAR, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Karen E. Escalante, x3358

## ATTACHMENT A-1

PERSON TO BE SEARCHED

    The person to be searched is ANAIT KHUDAGULYAN, a female born on September 17, 1974, with auburn hair and brown eyes, approximately 5'6" tall, including all personal items and containers in her possession and on her person.

[Instrumentality Protocol]

i

## ATTACHMENT B

### I.   ITEMS TO BE SEIZED

1.    The items to be seized are evidence, fruits, and instrumentalities of violations 18 U.S.C. § 2261A(2)(B) (Stalking) (hereinafter, the "SUBJECT OFFENSE"), namely:

    a.   All digital devices used to facilitate the above-listed violation and forensic copies thereof, including Samsung Galaxy Core Prime White cellular telephone with IMEI number 359354063897570 and MAC address 08:EC:A9:23:E4:22, serviced by T-Mobile, subscribed to "Astral Kouture" at telephone number (323) 485-7483, and believed to be used by ANAIT KHUDAGULYAN;

    b.   Records, documents, programs, applications, or materials related to Federal Bureau of Investigation Special Agent S.J., S.J.'s wife J.J., or S.J.'s family (hereinafter, "victims"), or any known members of the prosecution team, including law enforcement, special agents, deputy district attorneys and other investigators and prosecutors involved in the Durascam investigation (collectively, "the Durascam prosecution team");

    c.   Records, documents, programs, applications, or materials reflecting communications or correspondence with or about the victims or any friends, relatives or associates of the victims;

    d.   Records, documents, programs, applications, or materials reflecting communications or correspondence between KHUDAGULYAN and individuals in the Des Moines, Iowa area;

[Instrumentality Protocol]

i

e.   Records, documents, programs, applications, or materials reflecting communications or correspondence with or about the Durascam prosecution team;

f.   Records, documents, programs, applications, or materials that pertain to Guerillamail;

g.   Records, documents, programs, applications or materials that pertain to the identity of the user of the email address "lulubarke@yahoo.com";

h.   Records, documents, programs, applications, or materials depicting maps or diagrams for the victims or the Durascam prosecution team;

i.   Records, documents, programs, applications, or materials, including receipts, demonstrating the manner in which KHUDAGULYAN obtained information about the victims;

j.   Records, documents, programs, applications, or materials containing words and phrases similar to those used in text, e-mail, and voicemail messages sent to the victims;

k.   Contents of any calendar or date book from March 1, 2016, thru the present;

l.   Any indicia of occupancy, residency, or ownership of **KHUDAGULYAN'S APARTMENT** or the **HAROLD WAY ADDRESSS** and any containers or digital devices found therein, including, forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, letters, cancelled mail envelopes, and personal photographs;

[Instrumentality Protocol]

ii

m.   Any indicia of occupancy, residency, or ownership of any other premises or locations used to facilitate the SUBJECT OFFENSE, including forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, letters, cancelled mail envelopes, and personal photographs;

n.   Any indicia of occupancy, possession or control of the **BMW**, and any containers or digital devices found therein, including vehicle insurance documents, vehicle registration documents, department of motor vehicle documents, maintenance receipts, parking tickets, vehicle code violation tickets, purchase, lease, or rental agreements, loan payment receipts, letters, cancelled mail envelopes, and personal photographs;

o.   Records, documents, or materials relating to KHUDAGULYAN's employment, including pay stubs, timesheets, timecards, or direct-deposit records;

p.   Records, documents, programs, applications, or materials related to digital devices used to facilitate the SUBJECT OFFENSE as to S.J.;

q.   Records, documents, programs, applications, or materials reflecting telephone and internet service providers for KHUDAGULYAN, **KHUDAGULYAN'S APARTMENT**, or the **HAROLD WAY ADDRESS.**

r.   With respect to any digital device used to facilitate the above-listed violations or containing evidence

[Instrumentality Protocol]

iii

falling within the scope of the foregoing categories of items to be seized:

    i.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii. evidence of the attachment of other devices;

    iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    v.  evidence of the times the device was used;

    vi.  passwords, encryption keys, and other access devices that may be necessary to access the device;

    vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

[Instrumentality Protocol]

iv

viii.    records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

[Instrumentality Protocol]

v

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location.   The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.   The government will not search the digital device(s) beyond this 120-day period without first obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.   The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

[Instrumentality Protocol]

vi

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

c.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the digital device but may not access them

[Instrumentality Protocol]

(after the time for searching the device has expired) absent further court order.

g.  The government may retain a digital device itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the device is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending).  Otherwise, the government must return the device.

h.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.  In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.  Any digital device capable of being used to commit, further or store evidence of the offense(s) listed above;

[Instrumentality Protocol]

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   During the execution of this search warrant, the law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of any person, who is located at **KHUDAGULYAN'S APARTMENT** or at the **HAROLD WAY ADDRESS** during the execution of the search and who is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at **KHUDAGULYAN'S APARTMENT** or at the **HAROLD WAY**

[Instrumentality Protocol]

ix

**ADDRESS** and falls within the scope of the warrant, onto the fingerprint sensor of the device (only when the device has such a sensor) in order to gain access to the contents of any such device.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

[Instrumentality Protocol]

x

## AFFIDAVIT

I, ALLAN R. MACKINS, being duly sworn, declare and state as
follows:

### I.  PURPOSE OF AFFIDAVIT

7.    The purpose of this affidavit is to request four
search warrants (one for a person; one for a car; and two for
premises) to search for evidence, fruits, and instrumentalities
of Stalking, in violation of 18 U.S.C. § 2261A(2)(B).
Specifically, this affidavit is made support of the following
applications for search warrants to search the following:

a.    The person known as ANAIT KHUDAGULYAN, as further
described in Attachment A-1 ("**KHUDAGULYAN**"), for the items to be
seized as described in Attachment B.  Attachments A-1 and B are
incorporated herein by reference.

b.    A blue four-door 2006 BMW 525i, bearing
California license plate number 5RXU911 and Vehicle
Identification Number ("VIN") WBANE53586CK84705, which is
registered to KHUDAGULYAN at 224 West Dryden Street, Unit 309,
Glendale, California 91202 as further described in Attachment A-
2 (the "**BMW**"), for the items to be seized described in
Attachment B.  Attachment A-2 is incorporated herein by
reference.

c.    The premises located at 224 West Dryden Street,
Unit 309, Glendale, California 91202, as further described in
Attachment A-3 ("**KHUDAGULYAN'S APARTMENT**"), for the items to be
seized described in Attachment B.  Attachment A-3 is
incorporated herein by reference.

d.   The premises located at 5628 Harold Way, Apartment 1, Los Angeles, California 90028 as further described in Attachment A-4 ("**HAROLD WAY ADDRESS**"), for the items to be seized described in Attachment B.  Attachment A-4 is incorporated herein by reference.

## II.  SUMMARY OF PROBABLE CAUSE

8.   Since April 2016, Federal Bureau of Investigation ("FBI") Special Agent ("SA") S.J. and S.J.'s family have been the target of a campaign of harassment believed to be orchestrated by KHUDAGULYAN, the wife or ex-wife of a former target of a Los Angeles-area healthcare fraud investigation in which S.J. was involved in his capacity as an FBI SA.  Since 2007, S.J. has resided in the Des Moines, Iowa area. KHUDAGULYAN, who resides in the Los Angeles area, has contacted S.J. via text message on his FBI-issued cellular telephone number and has contacted S.J.'s wife, J.J., via e-mails sent through GuerillaMail.com, an anonymous email address service. KHUDAGULYAN has also contacted numerous associates of S.J., including neighbors, friends, and clergy in the Des Moines area, and has created a fictitious Yelp webpage that displays photographs of S.J., S.J.'s children, his in-laws, and his wife, and which includes disparaging remarks about S.J. and his family members.  Des Moines-area businesses have also received telephone calls from a female claiming to be S.J.'s wife and soliciting divorce and bankruptcy assistance.  The harassment campaign is ongoing and continuing in nature.

[Instrumentality Protocol]

9.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. FBI SA ALLAN R. MACKINS' TRAINING AND EXPERIENCE

10.  I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since May 2015. I am assigned to the Violent Crimes squad where I have been responsible for investigating violent crimes, including interstate threats, as well as murder for hire, extortion, bank robberies, and kidnappings within the FBI Los Angeles division territory.  I also completed 21 weeks of training at the FBI Academy at Quantico, Virginia, where I received formal training in criminal investigative techniques.

11.  During the course of my employment with the FBI, I have employed, or been involved in investigations that employed, various investigative techniques including search warrants, court-authorized interception of wire, oral, and electronic communications, pen registers/trap and trace, telephone toll analysis, physical surveillance, confidential sources, cooperating witnesses, grand jury proceedings, and fugitive apprehension tools.  Through my training, experience, and

[Instrumentality Protocol]

interaction with other law enforcement officers, I am familiar
with the methods employed by those who seek retribution against
federal investigators.

### IV. RELEVANT DEFINITIONS

6.   Based upon my training, experience, and research, I
know that:

a.   The Internet is a collection of computers and
computer networks which are connected to one another via high-
speed data links and telephone lines for the purpose of
communicating and sharing data and information.  Connections
between Internet computers exist across state and international
borders; therefore, information sent between two computers
connected to the Internet frequently crosses state and
international borders even when the two computers are located in
the same state.

b.   Individuals and businesses obtain access to the
Internet through businesses known as Internet Service Providers
("ISPs").  ISPs provide their customers with access to the
Internet using telephone or other telecommunications lines;
provide Internet email accounts that allow users to communicate
with other Internet users by sending and receiving electronic
messages through the ISPs' servers; remotely store electronic
files on their customers' behalf; and may provide other services
unique to each particular ISP.  ISPs maintain records pertaining

[Instrumentality Protocol]

4

to the individuals or businesses that have subscriber accounts

with them.  Those records often include identifying and billing

information, account access information in the form of log

files, email transaction information, posting information,

account application information, and other information both in

computer data and written record format.

      c.    An Internet Protocol address ("IP address") is

a unique numeric address used by each computer on the Internet.

An IP address is a series of four numbers, each in the range 0-

255, separated by periods (e.g., 121.56.97.178).  Every computer

attached to the Internet must be assigned an IP address so that

Internet traffic sent from and directed to that computer may be

properly directed from its source to its destination.  Most ISPs

control a range of IP addresses.

      d.    When a customer logs into the Internet using

the service of an ISP, the computer used by the customer is

assigned an IP address by the ISP.  The customer's computer

retains that IP address for the duration of that session (i.e.,

until the user disconnects), and the IP address cannot be

assigned to another user during that period.

      e.    Email, also known as "electronic mail," is a

popular means of transmitting messages and/or files in an

electronic environment between computer users.  When an

individual computer user sends email, it is initiated at the

[Instrumentality Protocol]

5

user's computer, transmitted to the subscriber's mail server, and then transmitted to its final destination. A server is a computer that is attached to a dedicated network and serves many users. An email server may allow users to post and read messages and to communicate via electronic means.

f.   Every email comes with a header which is one part of an email structure. It has basic information such as from whom the email comes, to whom it is addressed, date/time it was sent, and the subject of the email. This basic information comes in all "basic headers" that most email programs will automatically show. However, there is other detailed technical information that an email has. This detailed technical information can be viewed in a "full header." A full header will have information such as the mail server's name that the email passed through on its way to the recipient, the sender's IP address, and even the name of the email program and the version used. This information cannot be found in a brief header. A full header is crucial for cases involving email abuse, worm-infected email, harassment and forgeries.

g.   A website consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-Up Language and is transmitted from the web servers to various web clients via Hyper-Text Transport Protocol.

[Instrumentality Protocol]

## V.   STATEMENT OF PROBABLE CAUSE

### A.   Durascam Investigation Targets KHUDAGULYAN's Husband

7.   Based on my discussions with S.J., my discussions with other FBI agents who know S.J., my review of an e-mail from S.J. detailing the harassment, and my review of other relevant reports contained in the investigation's case file, I know the following:

a.   S.J. was one of the case agents assigned to the 10-year Durascam joint federal and state investigation into Medicare/Medi-Cal fraud in the Los Angeles area.  The lead prosecutor on the case was Los Angeles County Deputy District Attorney Amy Suehiro ("DDA Suehiro").  California Franchise Tax Board ("CFTB") SA Barbara Wynn ("SA Wynn") also worked on the investigation.

b.   One of the targets of that investigation, Dr. Thomas E. Mitchell ("Mitchell"), was criminally charged in California state court for operating a clinic that was engaged in illegal kickbacks for fraudulent medical charges.

c.   During the course of the 2012 trial proceedings against Mitchell, KHUDAGULYAN, who represented to S.J. that she was Mitchell's wife, approached S.J. during a recess in the trial proceedings and made inappropriate remarks to S.J.  DDA Suehiro reported the contact to the court.  The court indicated that it wished to admonish KHUDAGULYAN, but KHUDAGULYAN could not be located.  I understand from speaking to DDA Suehiro that, prior to this incident, KHUDAGULYAN had appeared in court each

[Instrumentality Protocol]

day of the trial.  KHUDAGULYAN stopped appearing for trial following this incident.

     d.   S.J. and KHUDAGULYAN have not had any contact again until this year.  S.J. currently resides in the Des Moines, Iowa area.

    B.   **Harassment Scheme: KHUDAGULYAN's 2016 Contact with Other Persons Involved in the Durascam Investigation**

    8.   On or about July 7, 2016, and October 19, 2016, I spoke with CFTB SA Wynn and learned the following:

    a.   In or about April 2016, SA Wynn received a phone call on her office telephone line from a female who did not identify herself, but who asked SA Wynn about the whereabouts of S.J.  SA Wynn spoke with the female briefly and told her that she did not know where S.J. was located.

    b.   Following that phone call, on or about April 16, 2016, SA Wynn received two voicemails from a female caller on her office telephone line.  The caller asked if Wynn knew where S.J. was living.  Although Wynn saved the voicemail messages, the phone system did not record a telephone number.  Based on SA Wynn's direct interactions with KHUDAGULYAN during the course of the Durascam investigation and trial, it is SA Wynn's opinion that the female on the phone was KHUDAGULYAN.

    9.   On August 17, 2016, I spoke with DDA Suehiro and learned the following:

    a.   On July 14, 2016, DDA Suehiro received a voicemail on her office telephone number from a female who did not identify herself.  In the message, the female caller asked

[Instrumentality Protocol]

for S.J.'s location.   DDA Suehiro was not able to save the
voicemail, and her office messaging system did not record the
caller's telephone number.   Based on DDA Suehiro's interactions
with KHUDAGULYAN during the course of the Durascam investigation
and trial, it is DDA Suehiro's opinion that the voice on the
message was that of KHUDAGULYAN.

    **C.**   **Harassment Scheme: KHUDAGULYAN's 2016 Contact with Des
Moines, Iowa area businesses**

    10.   Based on my discussions with S.J., my conversations
with Des Moines area real estate agents D.W. and R.S., my
discussions with L.R., an employee at the Miller Law Firm in Des
Moines, Iowa, and my conversations with Washington, D.C. based
real estate agent L.H., I know the following:

        a.   On June 25, 2016, bankruptcy attorney, N.B., who
services the Des Moines area, received a voicemail message from
a female who identified herself as "Mrs. James."   In the
voicemail message, "Mrs. James" asked that N.B. return her call
to telephone number (515) xxx-xxxx, which is S.J.'s FBI-issued
cellular telephone number.   N.B.'s caller identification records
reflect that the call came from (323) 485-7483 (**"Telephone
Number 1"**).

        b.   On June 27, 2016, two separate real estate
agencies who service the Des Moines area received voicemail
messages from a female who identified herself as J.J.

        c.   D.W. reported that, on June 27, 2016, he received
a voicemail message from a female claiming to be J.J.   In the
voicemail, the female caller said that she and S.J. were

divorcing and needed to sell their house.  The caller left S.J.'s FBI cell phone number as a return number.

      d.  R.S. reported that, on June 27, 2016, he received a voicemail message from a female claiming to be J.J.  The female caller said that she and S.J. were divorcing and needed to sell their house.  The caller left S.J.'s FBI cell phone number as a return number.

      e.  L.R., an employee at the Miller Law Firm, informed me that, on June 27, 2016, she received a voicemail message from a female who identified herself as the wife of S.J. In the message, the female caller said that she and S.J. were filing for divorce and asked L.R. to explain the process of filing for bankruptcy.  In the voicemail message, the female caller provided S.J.'s FBI-issued cellular telephone number as a call-back number.

      f.  On July 1, 2016, L.H., a real estate agent in Washington, D.C., received a voicemail message from a female claiming to be S.J.'s wife.  The caller said that S.J. wanted to sell his Washington, D.C. apartment and another property in California.  The Washington, D.C. address that the caller provided was a former address used by S.J. while S.J. was on a temporary duty assignment at FBI headquarters.  The return number left on the voicemail by the caller was that of S.J.'s FBI-issued cellular telephone number.

      g.  Each of the above-listed real-estate agents and businesses called S.J. on his FBI-issued cellular telephone number in June 2016 in response to the above-mentioned messages.

[Instrumentality Protocol]

11.   On September 16, 2016, I spoke with J.J., S.J.'s wife, and she informed me that she did not call any real estate agencies or attorneys in June or July 2016.

**D.    Harassment Scheme: KHUDAGULYAN's 2016 Contact with the Saint Francis of Assisi Parish in Des Moines, Iowa**

12.   In multiple conversations with S.J., discussions with Saint Francis of Assisi Priest A.W., Saint Francis of Assisi Secretary S.T., and family-friend S.S.D. on or about July 25, 2016, I learned the following:

a.   S.J. and his family are parishioners at Saint Francis of Assisi and his children attend the parish school.

b.   In July 2016, during church services, Saint Francis of Assisi Priest A.W. pulled S.J. aside and told S.J. that Saint Francis of Assisi had received voicemail messages from a female who inquired about S.J.  Specifically, on July 22, 2016, A.W. received a voicemail from a female who identified herself as "Ana."  In the message, the female caller asked if A.W. knew that S.J. was an FBI agent and "was there undercover." Saint Francis of Assisi Secretary S.J. also received a voicemail from a female who identified herself as "Ana."  In the message, the female caller asked if she knew that S.J. was "diabolical" and "not who he claimed to be."

c.   Both of the Parish voicemail messages were saved; however, the Parish phone system did not record the caller's telephone number.  I have listened to both messages.  Based on my review of those messages and on my review of messages left on

[Instrumentality Protocol]

SA Wynn's office voicemail as described above, I believe that the same caller left each of the messages.

d.   On July 25, 2016, S.S.D. received a voicemail message from a female who asked if she knew S.J.  The telephone number that appeared on S.S.D.'s caller identification was (323) 686-6308 ("**Telephone Number 2**"). S.S.D. saved the voicemail message and I have listened to that message.  Based on my review of that voicemail, and my review of the messages left for SA Wynn, A.W. and S.T., I believe that the same caller left each of the messages.

13.   In or around July 2016, I conducted FBI internal records checks, and learned that **Telephone Number 2** is serviced by Level 3/Vonage.  I have reviewed subscriber detail records from Vonage and learned that the Level 3/Vonage telephone service is billed to KHUDAGULYAN and Astgik Khudagulyan.  Based on my review of the Vonage Account Profile, I also know that the subscriber for **Telephone Number 2** is "a K".

E.   **Harassment Scheme: KHUDAGULYAN's Contact with Urbandale Water Utility**

14.   On July 26, 2016, I spoke to Urbandale Water Utility ("UBW") Customer Service Representative K.C. and learned the following:

a.   UBW is a water utility company located in Urbandale, Iowa.

b.   On June 29, 2016, a female claiming to be S.J.'s wife called UBW and requested that the water and utility services to S.J.'s current address be shut off.  Following this

[Instrumentality Protocol]

12

telephone call, UBW issued a letter of service termination to S.J. UBW's caller identification records reflect that the telephone call was made from the following telephone number: (319) 366-2461.

c. On July 26, 2016, K.C. answered a telephone call from a female claiming to be S.J.'s wife. The female caller provided the address for S.J.'s current residence and claimed that she was the owner of that residence. The female caller asked for the account's billing addresses in Des Moines, Iowa, and Washington, D.C. The telephone number displayed on UBW's caller identification system was (818) 766-9551 ("**Telephone Number 3**"), which, as discussed below, is affiliated with Studio City Rehabilitation Center at 11429 Ventura Blvd, Studio City, California 91604.

F.   **Harassment Scheme: KHUDAGULYAN's 2016 Contact with S.J.**

15. In multiple conversations with S.J. thereafter, I learned the following:

a. On July 11, 2016, S.J. received six unsolicited text messages on his FBI-issued cellular telephone number from an unidentified person using **Telephone Number 1**. One of the text messages stated, "Im sorry that I've been mean. That*s not who I am. But I've lost everything and I don't want to loose you. I want you to give me a chance, you mean so much to me. I want you to trust me."

[Instrumentality Protocol]

16.   S.J. has represented to me that there is no reason why KHUDAGULYAN should be contacting him, his family, or his associates.

**G.    Harassment Scheme: KHUDAGULYAN's E-mail Contact with S.J.'s wife**

17.   On August 5, 2016, S.J. provided me with copies of eleven e-mails that his wife, J.J., received in July and August 2016.  Based on my review of those e-mails, I know the following:

a.   On July 28, 2016, J.J. received four emails at her personal email address which had been sent from a www.GuerillaMail.com ("Guerillamail") email address.[1]  The first e-mail had the Subject line "Hi [J.J.'s first name], important" and was sent from following e-mail address 45ozeh+b91dq0dsuwd5k6q49506ykcyae0@guerillamail.com.  The e-mail said, in part, "Do you drink or take PSYCH medications?  Because you look mentally weak.  Living in your delusional fake world, Riding on the Coat Tail of others and feeling special.  Does [S.J.'s first name] keep you under his control and micromanage your life, like he does to his other women?"  The other e-mails were similar in nature.

b.   On August 5, 2016, J.J. received five e-mails at her personal e-mail address from a GuerillaMail email address, one of which had the Subject line "Go see your picture on YELP .st. sasisi school" and contained a link to a Yelp website.  The

---

[1]  I know from my training and experience that GuerillaMail is an autonomous email address service, meaning that it is used by persons to generate anonymous e-mail addresses.

email was sent from following e-mail address 46q5za+1wfr78yshc45qckj0qhqle0n6jwvypak@guerillamail.com.

c.   The header information on each of the eleven e-mails indicates that the emails were sent from Internet Protocol ("IP") address of 108.178.130.214 ("the Suspect IP Address").

18.   On August 23, 2016, I reviewed the Yelp website linked to the August 5 email and saw that it contained pictures of J.J., S.J.'s daughters, S.J.'s in-laws, and a picture of S.J. with "FBI AGENT" written in block letters across the image. After reviewing the Yelp website, I recognized that the comments written on the posted pictures were similar in nature to the emails that had been sent to J.J. on July 28, 2016.  In September 2016, I also reviewed records provided by Yelp which showed that the e-mail address used to create the Yelp website was lulubarke@yahoo.com.

19.   Public records checks show that the Suspect IP address is assigned to Time Warner Cable.  I have reviewed Time Warner's subscriber information records for the Suspect IP address which show that, at the dates and times at which the eleven emails were sent, the Suspect IP address was assigned to "Studio City Conv." at 11429 Ventura Blvd, Studio City, California 91604.

20.   In July 2016, I conducted an internet search for Studio City Rehabilitation Center and identified its website URL address of http://www.studiocityrehab.com.  The website provides an address of 11429 Ventura Blvd, Studio City, California 91604 and a telephone number that matches **Telephone Number 3**, which — as described above — is the number used to call U.B.W. in July

[Instrumentality Protocol]

2016.  Studio City Rehabilitation's website also contains a gallery of photographs.  One of the photographs depicts a group of four individuals standing together, each of whom is wearing a white laboratory coat.  The female on the far left-hand side of the photograph has dark auburn hair and is wearing a blue long-sleeved shirt underneath the laboratory coat.  Based on my review of KHUDAGULYAN's DMV photograph, I believe that the female who is standing on the far left-hand side of the photograph on Studio City Rehabilitation Center's website described above is KHUDAGULYAN and that she is currently an employee at Studio City Rehabilitation Center.

## VI. VICTIM IMPACT

21.  From July to October 2016, I spoke with S.J. on multiple occasions regarding the events discussed above.  During those conversations, S.J. indicated to me that S.J. and his wife felt unsafe as a result of KHUDAGULYAN's actions and were feeling a great deal of anxiety about the extent of KHUDAGULYAN's knowledge and exploitation of their personal lives and they were fearful of what further actions KHUDAGULYAN might take against them.

## VII. IDENTIFICATION OF KHUDAGULYAN'S APARTMENT, THE HAROLD WAY ADDRESS AND THE BMW

### A.  KHUDAGULYAN'S Department of Motor Vehicles Records

22.  On July 18, 2016, I obtained California Department of Motor Vehicles ("DMV") records for KHUDAGULYAN.  The records show a residence address of 224 West Dryden Street, Unit 309, Glendale, California 91202 (KHUDAGULYAN'S APARTMENT), and

[Instrumentality Protocol]

contain a driver's license photograph of KHUDAGULYAN.  DMV records reflect that KHUDAGULYAN was born in 1974, is 5'6" tall, weighs 125 pounds, and has black hair.  The female depicted in the DMV photograph has black hair.  DMV records also indicate that KHUDAGULYAN is the registered owner of the **BMW**.

   **B.   KHUDAGULYAN's Ties to the HAROLD WAY ADDRESS**

   23.  As discussed above, in July 2016, S.J. received several text messages from **Telephone Number 1**, and a bankruptcy attorney in Des Moines also received a voicemail message from **Telephone Number 1**.

   24.  On August 17, 2016, I spoke with DDA Suehiro and learned the following:

        a.   On July 5, 2016, "Anna K. Mitchell" filed a citizen's complaint with the CFTB.  The complaint alleges that CFTB SA Wynn, CFTB Investigator Albert MacKenzie, Department of Justice ("DOJ") SA Timothy Fives, DDA Suehiro, and S.J. all conspired against Mitchell and his family.  The complaint also alleges that the conspiracy arose out of the investigation into Mitchell and his involvement in the Durascam Medicare/Medi-Cal fraud.  In the signature line of the CFTB complaint, the complainant listed her name as "Anna K. Mitchell."  The complainant also listed P.O. Box 27002, Los Angeles, California 90027 as her address, **Telephone Number 1** as her phone number, and lulubarke@yahoo.com as her email address. The lulubarke@yahoo.com e-mail address matches the e-mail address that was used to create the Yelp website, discussed above.

[Instrumentality Protocol]

17

25.   In or about June 2016, I ran an FBI internal records check and that check revealed that **Telephone Number 1** is serviced by T-Mobile US, Inc. ("T-Mobile").  On July 16, 2016, I reviewed subscriber detail records from T-Mobile and learned that the owner of **Telephone Number 1** is "Astral Kouture," with an address of 5628 Harold Way, Los Angeles, California 90028 (the "**HAROLD WAY ADDRESS**").

26.   On July 13, 2016, I ran searches in public databases for KHUDAGULYAN, and the results of those searches revealed that five addresses were associated with KHUDAGULYAN.

a.   One address associated with KHUDAGULYAN is P.O. Box 27002, Los Angeles, California 90027 ("the P.O. Box").  As discussed above, the P.O. Box address matches the P.O. Box address that "Anna K Mitchell" provided in the CFTB complaint.

b.   Another address associated with KHUDAGULYAN is the **HAROLD WAY ADDRESS**. In or about September 2016, I ran both public and internal records checks on the **HAROLD WAY ADDRESS** and learned the following:

i.   Amaliya Khudagulyan, born in 1953, is associated with the **HAROLD WAY ADDRESS**.

ii.   On or about October 18, 2016, I reviewed records from the California DMV and learned that Amaliya Khudagulyan's current address is the **HAROLD WAY ADDRESS**.  The DMV records reflect that Amaliya Khudagulyan was born in 1953, is 5'02" tall, weighs 160 pounds, has black hair, and brown eyes.

[Instrumentality Protocol]

27.  In or about June 2016, I ran internal FBI records checks and external database checks on the name, "Astral Kouture," and those searches did not return any records for "Astral Kouture." Based on my training and experience, I believe that "Astral Kouture" is not a real person.

28.  On July 15, 2016, I ran searches in Los Angeles County public records business databases for "Astral Kouture" and found a Fictitious Business Name Statement ("FBN Statement") for a business with the name "Astral Kouture." Based on my review of the FBN Statement, I know the following:

a.  There are two addresses listed on the FBN Statement: (1) the **HAROLD WAY ADDRESS**, and (2) the P.O. Box.

b.  The registered owner listed on the FBN Statement is Astghik Khudagulyan, with an address matching the **HAROLD WAY ADDRESS**. In or about September 2016, I obtained California DMV records for Astghik Khudagulyan. The records show **KHUDAGULYAN'S APARTMENT** as a residence address, the P.O. Box as a mailing address, and the **HAROLD WAY ADDRESS** as an alternate address. The records also contain a driver's license photograph of Astghik Khudagulyan and a fingerprint impression. The DMV records show that Astghik Khudagulyan was born in 1987, has black hair, brown eyes, and is 5'3" tall. Based on my review of Astghik Khudagulyan's DMV photograph and my personal observations while conducting surveillance of KHUDAGULYAN, I believe that the female depicted in this photograph is a different person than KHUDAGULYAN.

[Instrumentality Protocol]

29.   On August 2, 2016, the Honorable John E. McDermott, United States Magistrate Judge, granted an application for the historical cell-site data for **Telephone Number 1** for the time period of June 1, 2016, through July 30, 2016.   On August 11, 2016, the FBI received the requested records from T-Mobile and I have reviewed those records.   Based on my review of the historical cell-site data for **Telephone Number 1**, I know that there is extensive cellular tower usage by **Telephone Number 1** near the following locations:

    a.   **KHUDAGULYAN'S APARTMENT,**

    b.   Studio City Rehabilitation Center, and

    c.   the **HAROLD WAY ADDRESS.**

    **C.   Surveillance at KHUDAGULYAN'S APARTMENT, the HAROLD WAY ADDRESS, and Studio City Rehabilitation Center**

30.   On September 22, 2016, while conducting surveillance at Studio City Rehabilitation Center, I observed the **BMW** parked one block north of Studio City Rehabilitation Center.   I saw a female with auburn hair wearing a white laboratory coat exit the driveway of Studio City Rehabilitation Center on foot and walk towards the **BMW**.   I then saw the female get into the **BMW** and leave the location.   I believe that the female I saw getting into the **BMW** is the same person who appears on the Studio City Rehabilitation Center website, as described above, and is KHUDAGULYAN.

31.   On September 30, 2016, while conducting surveillance at Studio City Rehabilitation Center, at about 11:55 a.m., I saw a female with auburn hair wearing a white laboratory coat exit a

[Instrumentality Protocol]

side door of the Studio City Rehabilitation Center with another female also in a white laboratory coat.  The female with auburn hair, whom I believe to be KHUDAGULYAN, appeared to take a cellular telephone out of her coat pocket, glance at it, and put it back in her pocket.  While on surveillance, I also observed the **BMW** parked one block north of Studio City Rehabilitation Center.  At about 3:00 p.m., I saw the same female with auburn hair wearing a white laboratory coat, and whom I believe to be KHUDAGULYAN, exit a side door of the Studio City Rehabilitation Center on foot and walk towards the **BMW**.  I then saw the female get into the **BMW** and leave the location.  The female in the **BMW** drove to the **HAROLD WAY ADDRESS** where she got out of the **BMW** and entered the apartment building at that address.  I then saw a female matching the description of Amaliya Khudagulyan step outside and greet KHUDAGULYAN. Both women then walked into the apartment together.

32.  On October 3, 2016, while conducting surveillance at **KHUDAGULYAN'S APARTMENT**, I observed the same female I had previously seen exit Studio City Rehabilitation Center on September 22 and 30, 2016, enter **KHUDAGULYAN'S APARTMENT**.  I also saw the **BMW** parked in parking space 85 inside the controlled-access gated garage for the apartment building at 224 West Dryden Street, Glendale, California.  Based on my observations, I believe that the female whom I saw exit Studio City Rehabilitation Center on September 22 and 30, 2016, is the same female whom I saw enter **KHUDAGULYAN'S APARTMENT** on October 3, 2016, and that the female is KHUDAGULYAN.

[Instrumentality Protocol]

21

## VIII.   IDENTIFICATION OF SUBJECT DEVICE

33.   On September 2, 2016, I spoke to Samsung Corporate and digital Forensic Investigations Manager Jim Hogg who provided information regarding **Telephone Number 1**.  Based on the T-Mobile subscriber records, Hogg confirmed the correct device IMEI number (359354063897571), device name (Samsung Galaxy Core Prime White), and MAC address 08:EC:A9:23:E4:22.

## IX. TRAINING AND EXPERIENCE ON HARASSMENT

34.   Based on my training and experience and my consultation with other agents, I know that law enforcement officers and their families are at high risk of being targeted by former subjects of investigations who may be disgruntled with the results of those investigations.  As a result, I know that special agents at the FBI do not make their private information publicly available and that they take targeted measures to keep that information private.  For instance, personal' and business telephone numbers and addresses are specifically shielded from public view so that FBI special agents and their families are less susceptible to becoming targets of stalking or harassment schemes.

35.   I also know that both former subjects of investigations and their family members, close friends, or other relations (i.e., associates), may feel that the investigators or law enforcement officers involved in the investigation are at fault for any consequences faced by the subject of the investigation.  Because of their disgruntlement, former subjects of investigations or their associates may stalk or harass

[Instrumentality Protocol]

22

investigators or other law enforcement officers, or the family members of investigators and law enforcement officers, who were involved in the investigation.

36.  I know from my training and experience that when former subjects of investigation or their associates perpetrate their harassment schemes, they do so from their residence, place of employment, or another secure location, _I also know that_ including them/vehicles. formers subjects of investigation or their associates use these locations to store items such as cellular telephones, digital devices, documents, and other evidence related to their stalking and harassment activities.  Former subjects of investigations or their associates often use digital devices to gather information on investigators, law enforcement officers, or the family members of investigators and law enforcement officers, who were involved in the investigation of the subject, in order to perpetrate the stalking and harassment scheme.

37.  Based on my training and experience, I also know that people usually carry cellular telephones on their person wherever they travel.

## X.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

38.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such

[Instrumentality Protocol]

23

as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

39.  Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

40.  Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and

[Instrumentality Protocol]

24

to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

41. The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

42. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive

[Instrumentality Protocol]

until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on a hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space, for long periods of time before
they are overwritten.  In addition, a computer's operating
system may also keep a record of deleted data in a swap or
recovery file.  Similarly, files that have been viewed on the
Internet are often automatically downloaded into a temporary
directory or cache.  The browser typically maintains a fixed
amount of hard drive space devoted to these files, and the files
are only overwritten as they are replaced with more recently
downloaded or viewed content.  Thus, the ability to retrieve
residue of an electronic file from a hard drive depends less on
when the file was downloaded or viewed than on a particular
user's operating system, storage capacity, and computer habits.
Recovery of residue of electronic files from a hard drive
requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

    43.  Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital

[Instrumentality Protocol]

devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

44. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not

[Instrumentality Protocol]

responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

45. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort

[Instrumentality Protocol]

through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

46. As discussed herein, based on my training and experience I believe that digital devices will be found during the search. I know from my training and experience and my review of publicly available materials that Apple Inc., Motorola, HTC, and Samsung, among other companies, produce devices that can be unlocked by the user with a numerical or an alpha-numerical password, or, for some newer versions of the devices, with a fingerprint placed on a fingerprint sensor. Each company has a different name for its fingerprint sensor feature; for example, Apple's is called "Touch ID." Once a user has set up the fingerprint sensor feature in the security settings of the device, the user can unlock the device by placing a finger or thumb on the device's fingerprint sensor. If that sensor recognizes the fingerprint or thumbprint, the device unlocks. Most devices can be set up to recognize multiple prints, so that different prints, not necessarily from the same person, will unlock the device. In my training and experience, users of devices with a fingerprint sensor feature often enable that feature, because it unlocks the phone more quickly than the entry of a passcode or password but still offers a layer of security.

47. In some circumstances, fingerprint sensors will not work, and a passcode must be entered to unlock the device. For example, with Apple, Touch ID will not work if (1) more than 48

[Instrumentality Protocol]

29

hours have passed since the device has been unlocked, (2) the device has been turned on or restarted, (3) the device has received a remote lock command, or (4) five attempts to match a fingerprint have been unsuccessful.  Other brands have similar restrictions.  I do not know the passcodes of the devices likely to be found at the Subject Premises.

48.  For these reasons, while executing the warrant, agents will likely need to use the fingerprints or thumbprints of any user(s) of any fingerprint sensor-enabled device(s) to attempt to gain access to that device while executing the search warrant.  The warrant seeks the authority to compel the use of the fingerprint and/or thumbprint of every person who is located at **KHUDAGULYAN'S APARTMENT** or the **HAROLD WAY ADDRESS** during the execution of the search and who is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at **KHUDAGULYAN'S APARTMENT** or the **HAROLD WAY ADDRESS** and falls within the scope of the warrant.  The government may not be able to obtain the contents of the devices if those fingerprints are not used to access the devices by depressing them against the fingerprint sensor at the time of the search.  Although I do not know which of the fingers are authorized to access on any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

[Instrumentality Protocol]

49.  An off-site review is particularly important in this case because at least one, but possibly many more, digital devices have been used to communicate with associates of S.J. Specifically, a cellular telephone serviced by T-Mobile was used to call and send text messages to multiple people on multiple instances.  In various calls, believed to be from the same person, KHUDAGULYAN, the caller identification on the receiving telephone displayed numbers that are not linked to KHUDAGULYAN. It is believed that KHUDAGULYAN was using applications on her cellular phone to mask or "spoof" her true number.  This suggests that KHUDAGULYAN is digitally savvy enough to also destroy or manipulate data linking her to the crimes, thereby risking destruction of evidence.  Furthermore, KHUDAGULYAN is also believed to be of Armenian descent.  Should her phone be set to use her native language, on-scene interpretation of the contents of her phone would prove extremely difficult.

50.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

///

## XI. CONCLUSION

51.   For all the reasons described above, there is probable cause to believe that the items listed in Attachments B-1 thru B-5, which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2261A(2)(B) (Stalking) will be found on **KHUDAGULYAN**, in the **BMW**, in **KHUDAGULYAN'S APARTMENT** or at the **HAROLD WAY ADDRESS,** as described in Attachments A-1 through A-4.

ALLAN R. MACKINS, Special
Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this ___ day of October 2016.

HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

[Instrumentality Protocol]